Receipt # 039872

ORIGINAL

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAR - 5 2004
U.S. COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **AXION CORPORATION,**<br>**Plaintiff,**<br>**v.**<br>**THE UNITED STATES,**<br>**Defendant.** | **No.** 04- 297C |

## COMPLAINT

Plaintiff Axion Corporation ("Axion") brings this civil action for relief from a "deemed denied" final decision of a Navy Contract Officer concerning contract N00106-96-C-KA09 ("Navy Contract") (Exhibit 1).

## JURISDICTION

1. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1491(a). Plaintiff brings this action pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 601, et seq. Specifically, applicable is 41 U.S.C. § 601(c)(5): "Any failure by the contracting officer to issue a decision on a contract claim within the period required will be deemed to be a decision by the contracting officer denying the claim and will authorize the commencement of the appeal or suit on the claim ...."

## THE PARTIES

2. Plaintiff Axion is a small business incorporated under the laws of the State of Alabama. For nineteen years, Axion has been in the business of manufacturing component parts for the United States Government based on competitively awarded fixed-price contracts. Axion's principal office and principal place of business is in Huntsville, Alabama.

3. Defendant is the United States of America ("United States" or "Government"), acting by and through the Department of the Navy ("Navy"), and its officers, employees, and agents.

## PROCEDURAL HISTORY

4. On or about November 12, 2002, a Navy Contracting Officer issued Modification No. P00021 terminating the Navy Contract for default. (Exhibit 2).

5. Axion initially appealed to the Armed Services Board of Contract Appeals (ASBCA No. 54125). The Government moved to dismiss for lack of jurisdiction for failure to appeal within 90 days of receipt of contracting officer's final decision. Axion joined the Government's motion, and on June 17, 2003, the ASBCA dismissed Axion's ASBCA appeal "without prejudice to the contractor's right to bring an action directly in the United States Court of Federal Claims."

6. On or about October 31, 2003, Axion mailed to the Contracting Officer a Settlement Proposal consisting of three volumes.

7. The cover letter to the Settlement proposal in Volume I ended with the following sentence: "I request that you either issue a final decision within

sixty days or notify Axion of the time within a decision will be issued. 41 U.S.C. § 605(c)."

8. Volume I contained the Certification required by the Contract Disputes Act of 1978. (Exhibit 3.)

9. The Contracting Officer has neither issued a final decision nor notified Axion of when a decision will be issued.

10. Volume III of the Settlement Proposal contained thirteen requests for equitable adjustments ("REAs").

11. The cover letter to Volume III stated: "Please note, as separately explained at the beginning of each REA, the issue of Axion's entitlement is independent from the Termination for Default."

12. The cover letter to Volume I stated: "your letter of September 22, 2003 expressly stated that you are not willing to consider a termination settlement proposal. Hence, there appears to be an impasse regarding the settlement proposal which has ripen into a dispute. Accordingly, I have executed the appropriate certification required by the Contract Disputes Act of 1978."

13. In as much as the thirteen REAs were a subset of Axion's settlement proposal, the impasse on the settlement proposal was also an impasse on the REAs, thus making them claims. The matter ripened into a dispute for which the failure of the Contracting Officer to issue a final decision is a "deemed denied."

14. On November 6, 2003, Axion filed a complaint against the United States, which the Clerk for the Court of Federal Claims docketed as No. 03-2644C

(hereinafter "Case 03-2644C" or "T4D Case"). Case 03-2644C is Axion's appeal of the decision of the Contracting Officer terminating contract N00106-96-C-KA09 for default, and Axion's claims requesting this Court convert the termination for default to a termination for convenience.

## BACKGROUND

15. The PS-115 power supply is a dormant battery located in a munition that is fired from a large bore weapon such as an artillery piece.

16. A PS-115 power supply becomes active when a projectile containing a PS-115 is fired from an artillery piece or a mortar. The acceleration produces as much as 25,000 Gs of force. This force causes cutters within the PS-115 to penetrate and cut a diaphragm. Electrolyte (acid) passes through the penetrated diaphragm and permeates the cells. The resulting chemical reaction must generate 23.0 volts of electrical power for 150 seconds. The resulting electrical charge causes the fuse to detonate the explosive.

17. The Navy discovered that numerous PS-115s in the Navy's inventory were leaking electrolyte. The Navy had a requirement to procure new PS-115s to replace the leaking PS-115s.

18. In 1995, the Navy issued a solicitation for a fixed-price production contract to acquire 55,209 PS-115 power supplies. The solicitation also contained an option quantity for an additional 55,209 units.

19. The United States had been acquiring PS-115 power supplies for over two decades. However, prior to 1995, the Navy relied on the Army to

acquire PS-115s.

20. The solicitation issued in 1995 contained design specifications that were primarily "level-III," "build-to-print" drawings.

21. Axion submitted the lowest price proposal. After a pre-award survey, Axion was awarded the Navy Contract (Exhibit 1) on or about December 14, 1995.

22. The PS-115 power supplies were made of parts that are mentioned and described in the Automated Data List ("ADL"), which was incorporated into the Navy Contract. (See Navy Contract, Exhibit 1).

23. To the maximum extent feasible, the Navy seeks to acquire munitions that have a shelf life which exceeds ten years.

24. The Navy Contract required a First Article Test ("FAT"). The Navy Contract also required Axion to provide all acceptance inspection equipment "necessary to assure conformance of components and end items to contract requirements." (Exhibit 1 at p. 97).

25. Although the Navy Contract does not specifically mention an "air gun," previous contracts for PS-115s used an air gun as the acceptance inspection equipment "necessary to assure conformance of components and end items to contract requirements." *Id.*

26. Except for firing a "round" from an actual artillery piece or mortar the air gun has been the only means used by the Government or its contractors "to assure conformance of components and end items to contract requirements." *Id.*

27. The Navy Contract specification required the electrolyte (acid) to be stored in a copper reservoir.

28. After the electrolyte had been stored in the copper reservoir for several months, the electrolyte would corrode the copper reservoir.

29. The corrosion resulted in the electrolyte leaking out of the copper reservoirs.

30. Any P-115 that will leak electrolyte within two years of being placed into a Navy munition is unfit for service in the fleet.

**COUNT I**

**(IMPOSSIBILITY/IMPRACTICABILITY - AIRGUN TEST EQUIPMENT)**

31. All other allegations of the Complaint are incorporated herein by reference.

32. The solicitation issued by the Navy contained the following background information on previous acquisitions of PS-115s by the United States:

| CONTRACTOR | AWARD DATE | QUANTITY | UNIT PRICE |
|---|---|---|---|
| Accudyne Corp | 8/93 | 45,736 EA | $16.90 |
| Accudyne Corp | 6/92 | 30,000 EA | $13.54 |

(See Exhibit 1).

33. Prior to the award of the Navy Contract, the Army Research Laboratory ("ARL") had developed an air gun that the ARL used for testing PS-115s.

34. For one or more of the contracts awarded to Accudyne Corporation,

the United States provided an air gun to Accudyne Corporation to test the PS-115s.

35. In a letter dated, January 17, 1996, Axion requested the Navy to provide Axion with an air gun.

36. The Navy declined to provide Axion with an air gun.

37. Axion was told by an official at ARL that ARL would provide drawings of ARL's air gun to Axion.

38. Axion mailed a check to ARL to pay the expense of copying the drawings of the air gun

39. ARL refused to provide the drawings of the air gun to Axion.

40. The Navy Contracting Officer was told, in a letter by Axion dated April 15, 1997:

> Axion was then informed that they [ARL] would furnish us a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but then after several inquiries, we were informed that they could not furnish the drawings.

41. The Navy Contracting Officer did not assist Axion by obtaining the drawings of the air gun from ARL to provide to Axion.

42. A design criteria for the ARL air gun was to be able to test 40 power supplies in 4 hours at the high-spin rate. The ARL air gun was never able to meet this design criteria.

43. Because of the limited number of PS-115s that the ARL air gun could test in an eight-hour period, the ARL air gun was inadequate for the special test equipment requirements of contract N00104-96-C-DA09.

44. On average, the ARL air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for less than fifty percent of the times the air gun was fired.

45. In a letter dated April 30, 1996, Axion informed the Navy Contracting Officer that Axion and the ARL were completing negotiations on a Cooperative Research and Development Agreement ("CRDA") to develop an air gun. Axion provided the Navy Contacting Officer with a draft of the CDRA signed by Axion.

46. According to the draft CDRA, the ARL's point of contact was Mr. Mel Morganstein, tel. 301-394-3114.

47. ARL subsequently declined to sign the CDRA.

48. Without the CRDA, ARL declined to inform Axion of its lessons-learned in fabricating an air gun.

49. Without the CRDA, ARL declined to make its expertise on the air gun available to Axion.

50. The Navy Contracting Officer did not contact ARL to request that ARL enter into the CRDA with Axion.

51. No person who provided technical support to the Navy Contracting Officer had experience in fabricating an air gun capable of testing the PS115.

52. Axion's memorandum to the Navy dated May 30, 1997 stated: "Since Harry Diamond Labs will not perform to our previous agreement and will not furnish drawing of their Spin Gun, Axion had no other choice than to design and build our own spin gun for testing."

53. In attempting to develop the air gun without the assistance of the Government, Axion experienced extreme and unreasonable difficulty.

54. In attempting to develop the air gun without the assistance of ARL, Axion experienced extreme and unreasonable expense.

55. Contract N00106-96-C-KA09 did not place the risk on Axion that the air gun would be commercially impractical.

56. The termination for default of the Navy Contract should be converted to a termination for convenience because the development of the air gun involved extreme and unreasonable difficulty and expense, thus rendering the air gun commercially impracticable. The commercial impracticability excused the default under paragraph (g) of FAR 52.249-8.

57. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting, first, to purchase and, later, to fabricate the airgun.

**COUNT II**

**(FAILURE TO DISCLOSE SUPERIOR KNOWLEDGE – AIRGUN)**

58. All other allegations of the Complaint are incorporated herein by reference.

59. Prior to the award of the contract, the ARL had promulgated a

technical report on the airgun setting forth a detailed description of the test projectile; air gun; spinner assembly; catch tube; as well as setting out wiring diagrams for several of the airgun's components.

60. The Government never provided Axion with a copy of the technical report.

61. At the time of the Navy Contract award, Axion did not have any knowledge of the difficulties that the United States (as well as previous vendors) had experienced with air gun testing of PS-115s.

62. At the time of the Navy Contract award, the United States had not informed Axion of the difficulties that ARL (and previous vendors) had experienced with air gun testing of PS-115s.

63. The solicitation issued by the Navy makes no requirement for an air gun.

64. The specifications in the solicitation issued by the Navy for the PS-115s involved a design specification for a level III, build-to-print drawings.

65. There was nothing in the solicitation putting Axion on notice that it should anticipate difficulties with special test equipment.

66. There was nothing in the solicitation that put Axion on notice that Axion would have to perform a significant amount of developmental work to fabricate the special test equipment for the PS-115.

67. The termination for default should be converted to a termination for convenience because the Government had superior knowledge of the difficulties in

producing the air gun but failed to disclose its superior knowledge to Axion, thereby excusing the default under paragraph (g) of FAR 52.249-8.

68. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to fabricate the airgun.

**COUNT III**

**(MISREPRESENTATION CONCERNING THE AIRGUN)**

69. All other allegations of the Complaint are incorporated herein by reference.

70. The Navy's solicitation was seeking a previously manufactured, build-to-print deliverable.

71. The Navy never put Axion (or others) on notice that to perform the Navy Contract, the contractor who was awarded the Navy Contract would have to design and develop an air gun.

72. The Navy misled Axion that either an air gun would be made available which Axion could use to test the PS-115 or level three, build-to-print drawings existed that would have enabled Axion to fabricate the air gun without any developmental work.

73. The misrepresentation was material. The effort by Axion to design and develop an air gun represented more than 20% of the total base contract price of $1,313,974.20.

74. The material misrepresentation is a basis to convert the termination for default into a termination for convenience because the material

misrepresentation excused the default under paragraph (g) of FAR 52.249-8.

75. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting first to purchase and later to fabricate the airgun.

## COUNT IV

## (IMPLIED WARRANTY AIRGUN WAS NONDEVELOPMENTAL ITEM)

76. All other allegations of the Complaint are incorporated herein by reference.

77. The general rule is that there is ordinarily no implied warranty that materials specified in the Navy Contract specifications will be commercially available. However, an implied warranty exists where the Government has a prior relationship with the supplier of the unavailable material and there are no specifications for that material which the contractor can use to either make it itself or have it made.

78. ARL is an entity of the United States. The Government had prior relationship with the potential supplier of the unavailable air gun - ARL.

79. There were no specifications for the air gun that Axion could either use to either make the air gun or have the air gun made.

80. The Navy Contract contained an implied warranty that the air gun was a non-developmental item.

81. The Navy breached the implied warranty that the air gun was a non-developmental item.

82. The breach of the implied warrant is a basis to convert the

termination for default into a termination for convenience because the breach of the implied warranty excused the default under paragraph (g) of FAR 52.249-8.

83. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to first purchase and later fabricate the airgun.

## COUNT V

## (DUTY TO COOPERATE – AIRGUN)

84. All other allegations of the Complaint are incorporated herein by reference.

85. In a letter dated January 17, 1996, Axion requested the Navy supply an air gun to perform testing on the PS-115s:

> We understand that the government has supplied two air guns as government furnished material to a previous contractor, Accudyne, to perform the final tests. We hereby request one unit supplied to Axion Corp for performance of final testing.

86. The United States did not provide an air gun to Axion to perform the testing.

87. In a letter dated April 15, 1997, Axion informed the Navy Contracting Officer as follows:

> Axion was then informed that they [ARL] would furnish us a set of drawings of the spin gun, and Axion sent a check to cover copy costs per the requested amount for copies but then after several inquiries, we were informed that they could not

furnish the drawings.

88. The Navy Contracting Officer did not contact ARL to obtain the drawings for Axion.

89. In a letter dated April 30, 1996, Axion informed the Navy Contracting Officer that Axion and the ARL were completing negotiations on a Cooperative Research and Development Agreement ("CRDA") to develop an air gun. Axion provided the Navy Contacting Officer with a draft of the CDRA signed by Axion.

90. ARL subsequently declined to sign the CDRA.

91. Without the CRDA, the ARL would not inform Axion of its lessons-learned in fabricating an air gun.

92. Without the CRDA, the ARL would not make its expertise on the air gun available to Axion.

93. The Navy Contracting Officer did not contact ARL to request ARL enter into the CRDA with Axion.

94. The United States did not to do what was reasonably necessary to enable Axion to perform. The United States did not make an air gun available to Axion; it did not make the drawings for the air gun available to Axion; and it did not cooperate with Axion to allow Axion to learn from the mistakes of the Government in attempting to develop an air gun for testing of the PS-115s.

95. By failing to do what was reasonably necessary to enable Axion to perform, the United States violated its duty to cooperate.

96. The violation of the duty to cooperate is a basis to render the alleged default "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

97. Axion is entitled to be compensated under FAR § 52.249-2(g) for the additional time and expense incurred by Axion as a result of the government's lack of cooperation.

## COUNT VI

## (MUTUAL MISTAKE – AIRGUN)

98. Count VI is being pled in the alternative to Count V.

99. Prior to the award of contract N00104-96-C-KA09, the Navy had relied upon the Army to acquire PS-115s.

100. The Army has been delegated by the Office of Secretary of Defense as the lead military department for the acquisition of munitions.

101. At the time of the Navy Contract award, the Navy was unaware that the air gun would require a significant developmental effort.

102. Axion was unaware at the time of the award of the Navy Contract that the air gun would require a significant developmental effort.

103. The fact that the air gun required a significant developmental effort had a material effect on the agreed exchange of performances.

104. It was a basic assumption of Contract N00104-96-C-KA09 that this fixed-price production contract would not require a significant development effort.

105. The mutual mistake of fact as to a basic assumption is a basis to render the alleged default "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

106. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting first to purchase and later to fabricate the airgun.

## COUNT VII

## (SUPERIOR KNOWLEDGE—ELECTROLYTE CORRODING COPPER)

107. All other allegations of the Complaint are incorporated herein by reference.

108. Axion's letter to the Contracting Officer, dated August 27, 2001 stated:

> The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove (sic) the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms. We had discussion with Mr. Carey Jackson Quality Assurance Manager, of CP/PHIBROCHEM, the approved source of supply of the acid (34-A, Electrolyte). He states that it is a fact that this acid will eventually penetrate the copper.

109. As shown in Exhibit 4, two Army employees, Jeff Swank and Allan Goldberg of the ARL, were aware that "Initial studies of reservoir/electrolyte materials indicated that they were not compatible."

110. As shown in exhibit 4, two Army employees, Jeff Swank and Allan Goldberg of the ARL, were aware that concerning the PS-115s "virtually every lot produced prior to Nov 1980 contained leaking batteries."

111. As shown in exhibit 4, it is the norm for the Department of Defense that "Items developed for munitions have a 20-year shelf life."

112. Axion bid on the Navy Contract without any knowledge that PS-115s manufactured pursuant to the level three drawings would result in the electrolyte corroding the copper reservoir.

113. The United States was aware that Axion had no knowledge of, or reason to know of, that the electrolyte would corrode the copper reservoirs.

114. The Navy Contract specification mislead Axion to believe that if Axion followed the level III, build-to-print drawings, there would be no problem with the electrolyte leaking through the corroded copper.

115. Nothing in the specification put Axion on notice to inquire as to whether the electrolyte would corrode the copper reservoir.

116. As shown in Exhibit 4, the United States knew that the PS-115s would leak electrolyte after several months because the electrolyte would corrode the copper reservoirs.

117. At no time did the Government reveal its superior knowledge of the

PS115 leaking electrolyte to Axion.

118. The termination for default should be converted to a termination for convenience, because the Government had superior knowledge of the electrolyte corroding the copper reservoirs, but failed to disclose its superior knowledge to Axion, thereby excusing the default under paragraph (g) of FAR 52.249-8.

119. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to manufacturer copper reservoirs that can store electrolyte.

## COUNT VIII

## (LEAKING ELECTROLYTE - *SPEARIN* DOCTRINE)

120. All other allegations of the Complaint are incorporated herein by reference.

121. Under the Spearin Doctrine, if the Government provides a design specification to a contractor, the Government warrants that if the deliverable is produced according to the design specification, the contractor shall not be responsible for the consequences of defects in the specifications.

122. The specification in contract N00104-96-C-KA09 for the PS-115 was predominantly a design specification.

123. The specification in contract N00104-96-C-KA09 required the electrolyte to be stored in a copper reservoir.

124. After a year, electrolyte stored in a copper reservoir will corrode the copper reservoir.

125. Axion was not aware at the time of contract award that, after a year,

electrolyte stored in a copper reservoir will corrode the copper reservoir.

126. Upon learning that, after corroding the copper reservoir, the electrolyte would leak, Axion gave the United States notice of the corrosion problem in a letter dated August 27, 2001.

127. Axion incurred unanticipated costs in trying to meet the defective specification.

128. Under the *Spearin* Doctrine, the Government made an implied warranty that the electrolyte would not corrode the copper reservoirs. The termination for default should be converted to a termination for convenience because the Government's breach of the implied warranty excused the default under paragraph (g) of FAR 52.249-8.

129. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to comply with the specifications regarding a copper reservoir for the electrolyte.

**COUNT IX**

**(IMPOSSIBILITY – ELECTROLYTE CORRODING COPPER)**

130. All other allegations of the Complaint are incorporated herein by reference.

131. The Army requires that "Items developed for munitions have a 20-year shelf life." Exhibit 4.

132. The Army is the lead military department for the acquisition of munitions.

133. The corroding of the PS-112's copper reservoir by the electrolyte, after several months, enables the electrolyte to leak.

134. A PS-115 will not meet the requirements of the Government if the PS-115 leaks electrolyte within a year of the PS-115 being accepted by the Government.

135. The termination for default should be converted to a termination for convenience because it is impossible for a copper reservoir to store electrolyte for several months without leaking. This impossibility excused the default under paragraph (g) of FAR 52.249-8.

136. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to comply with the impossible specification of manufacturing a copper reservoir that can hold electrolyte without corroding.

**COUNT X**

**(NAVY'S REASONS FOR TERMINATION FOR DEFAULT NOT A VALID BASIS TO REJECT FAT)**

137. All other allegations of the Complaint are incorporated herein by reference.

138. Deficiencies in a first article that are correctable in production are not a valid basis for an outright disapproval of a first article.

139. P00021, dated November 12, 2003, sets forth the Navy's two reasons for terminating the contact for default:

> The Navy examined Axion's FATR and disapproved the

> First Article for failure to meet the requirements of Contract Data Requirements list A004 and the lack of information that would pertain to test procedures test equipment, or data analysis that is relevant to the performance requirements. Furthermore, a total of 25 of the 66 First Article Power Supplies failed to meet the performance requirements of 11744726. The Navy's letter of October 01, 2002 advised Axion of its First Article disapproval.

140. As stated in P00021, the Navy's first basis for the termination for default was "[t]he Navy examined Axion's FATR and disapproved the First Article for failure to meet the requirements of Contract Data Requirements List A004 and the lack of information that would pertain to test procedures test equipment, or data analysis that is relevant to the performance requirements."

141. The alleged failures that form the first basis for the termination for default are "information defects."

142. An information defect does not arise to the level of a deficiency that is not correctable in production. Hence, the first basis for the termination for default was not a valid basis to reject the FAT.

143. According to P00021, the Navy's second basis for the termination for default was "a total of 25 of the 66 First Article Power Supplies failed to meet the performance requirements of 11744726."

144. The airgun used by Axion on the second FATS was the same airgun

that FATS used to successfully complete the first FATS.

145. At the beginning of the second FAT testing in early September 2002, several of the tests involving the air gun failed to produce data because of a broken connector in the air gun's projectile.

146. Once the problem with the broken connector was corrected, 31 PS-115s were consecutively tested as successful.

147. Axion had previously passed the FAT.

148. A Navy memorandum to Axion, dated September 28, 2001 states:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

149. The 25 failures that the Navy relied upon for the termination for default were attributable to a systemic failure in the air gun.

150. Because these 25 failures were attributable to the air gun, the 25 failures provided no basis to reach a conclusion regarding the purpose of the second FAT—"to verify the manufacturing process and material" for the plate stock meet the Navy Contract's specifications.

151. The 31 consecutive successful shots are cogent proof that the plates manufactured by Axion met the specifications.

152. The 25 failures provided the Government no basis to draw a conclusion regarding the plates. And the next 31 successes provided cogent proof that the plates met the specifications. Therefore, the 25 failures do not provide a valid basis for the termination for default.

153. Because the reasons articulated by the Navy in P00021 did not provide a valid basis to termination for default, the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE.

154. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to manufacturer PS-115s for a contract that was not properly terminated for default.

**COUNT XI**

**(CONTRARY TO P0021, NAVY APPROVED THE SECOND FAT)**

155. All other allegations of the Complaint are incorporated herein by reference.

156. P00021 states "The Navy … disapproved the First Article…."

157. Page 31 of the Navy Contract states: "Acceptance or rejection shall be accomplished by the cognizant GQAR based upon his own inspection(s) and the results of the First Articles . . .."

158. The Government's Quality Assurance Representative (GQAR) was Mr. Henry Strickrod. Mr. Strickrod was assisted by Mr. Vartan.

159. The GQAR had authority to approve the second FAT.

160. Mr. Vartan was Mr. Strickrod's representative at Axion on Friday,

September 6, 2002 as Axion was conducting the second FAT.

161. Mr. Vartan was able to ascertain whether the test was successful after the firing of the air gun by examining a chart that plots the voltage over time.

162. Mr. Vartan observed Mr. Alex Latifi, owner, President and CEO of Axion, successfully complete 31 consecutive tests using Axion's air gun.

163. After observing the 31 consecutive successful tests, Mr. Vartan directed Axion to stop the testing.

164. After observing the 31 consecutive successful tests, Mr. Vartan related to Mr. Latifi that as far as he [Mr. Vartan] was concerned, Axion had passed (meaning the second FAT) and it was wasteful to further destroy good units. (When a PS-115 power supply is tested, it is necessarily destroyed in the process of testing.).

165. Mr. Vartan's statement to Mr. Latifi constituted approval of the second FAT.

166. Because Mr. Vartan approved the second FAT, P00021 was not correct in its statement that the Navy disapproved the first article. The Navy's mistake about the second FAT being approved requires the termination for default to be converted to a termination for convenience pursuant to FAR § 52.249-8(g), "the rights and obligations of the parties shall the same as if the termination had been issued for the convenience of the Government."

167. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to manufacturer PS-115s for a contract that was not properly

terminated for default.

## COUNT XII

## (BREACH OF DUTY TO COOPERATE—SECOND FAT)

168. All other allegations of the Complaint are incorporated herein by reference.

169. Concerning the FAT, the Navy Contract specification provides that "the tests shall be performed by the contractor under then observation of the government QA representative and a representative of the cognizant technical agency." *Id.* at §4.3.

170. On Friday afternoon, September 6, 2002, Mr. Vartan expressly directed Axion to stop the testing after Mr. Vartan had observed Axion successfully tested 31 consecutive units using the air gun.

171. Mr. Vartan departed on Friday afternoon, September 6, 2002 and did not return the following Monday.

172. Axion was not authorized to continue the tests without a Government inspector present.

173. Axion was ready, willing, and able to continue testing at the time of Mr. Vartan's departure and after Mr. Vartan departed.

174. By not having an inspector available, the Navy has breached its implied duty to cooperate.

175. If the Government had complied with its duty to cooperate, Axion would have fired an ample number of units to satisfy the Navy that the plates

manufactured by Axion met the specifications.

176. In light of the Government's violation of its duty to cooperate, Axion was excused from further testing. Since Axion was excused from further testing regarding the second FAT, the alleged default was "excusable" under paragraph (g) of FAR 52.249-8 Default (Fixed-Price Supply). Pursuant to paragraph (g), the termination for default should be converted to a termination for convenience.

177. In light of the fact that the termination for default was improper because of the government's breach of its duty to cooperate, Axion is entitled to be compensated under FAR § 52.249-2(g).

## COUNT XIII

## (AIRGUN NOT AN ACCURATE TEST OF PLATING)

178. All other allegations of the Complaint are incorporated herein by reference.

179. The Government has the ultimate burden of proving that a termination for default was proper. This includes providing that the tests the Government relied upon were accurate and reasonably calculated to determine compliance with the Navy Contract specification.

180. According to correspondence sent to Axion by the Navy, dated September 28, 2001, the primary purpose for the second FAT was to "validate the manufacturing process" involving the plate stock produced by Axion.

181. Air guns used to test PS-115s often suffered from systemic failures.

182. The most frequent cause of air gun systemic failures is the breaking of components within the projectile caused by the thousands of G-force applied to the components during testing.

183. On average, the ARL air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for less than fifty percent of the times the air gun was fired.

184. On average, Axion's air gun was only able to collect sufficient data to ascertain if a PS-115 met the specifications for 75% to 80% of the times the air gun was fired.

185. Because of the lack of reliability of air guns, air gun testing of plates manufactured by Axion could not accurately determine compliance with the Navy Contract specifications.

186. The Navy Contract, at page 7, incorporated by reference technical data package ("TDP") 19202-11744726. The TDP states at paragraph 4.4.6.2.2:

> Field Tests. The Government may at its discretion perform the following field tests. One hundred and eighty power supplies may be fired from the designated artillery pieces as specified below.

187. The Government did not perform the field tests authorized in the TDP.

188. Because of its failure to exercise its discretion to perform field testing, the Government, rather than Axion, is responsible for any lack of an

accurate test and any alleged insufficiency in testing data with regard to the second FAT.

189. Because the air gun tests the Government relied upon were not accurate and reasonably calculated to determine compliance with the Navy Contract specification for the plates, the Navy lacked a reliable basis to disapprove the second FAT. Since the termination for default lacked a reliable basis to disapprove the second FAT, the termination for default should be converted to a termination for convenience.

190. In light of the Navy's wrongfully reliance on a test that was not determinative of whether the plates complied with the specification, Axion is entitled to be compensated under FAR § 52.249-2(g).

**COUNT XIV**

**(WHAT THE NAVY ASSERTS IS A "SECOND FAT" WAS, IN FACT, NOT A FAT)**

191. All other allegations of the Complaint are incorporated herein by reference.

192. When contract N00104-96-C-KA09 was awarded in 1995, FAR § 9.301 included the following definition of first article test: "means testing and evaluating the first article for conformance with specified contract requirements before or in the initial stages of production." FAR § 9.302 further explained that first article testing "ensures that the contractor can furnish a product that conforms to **all** contract requirements for acceptance." (Emphasis added.)

193. The firing of the PS-115s in the air gun in early September 2002 (called by the Navy the "second FAT") was not a FAT because the test did not ensure that the PS-115s conformed to "**all** contract requirements for acceptance."

194. Prior to September 2002, Axion had put the Navy on notice that the PS-115s manufactured by Axion could not meet all the Navy Contract requirements because the electrolyte, after corroding the copper reservoir, would leak.

195. Because the test dubbed by the Navy as the "second FAT" did not ensure the PS-115 conformed to all Navy Contract requirements, the test was not, in fact, a FAT.

196. Because the testing in September 2002 was not a FAT, FAR § 52.209-3 did not apply.

197. Since FAR § 52.209-3 did not apply, the Navy could not terminate the Navy Contract for default without first issuing a cure notice to Axion.

198. The Navy did not issue a cure notice for the termination for default set forth in P00021.

199. The Navy's failure to issue a cure notice renders the termination for default defective. The defective termination for default mandates that the termination for default be converted to a termination for convenience.

200. In light of the fact that the termination for default is defective for failure to issue a cure notice, Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to manufacturer PS-112s.

## COUNT XV

## (APPLICATION OF SPEARIN DOCTRINE TO AXION'S PLATES)

201. All other allegations of the Complaint are incorporated herein by reference.

202. A Navy memorandum to Axion, dated September 28, 2001, stated:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

203. The manufacturing process to be validated by the second FAT was set forth in the Navy Contract as NAVORD OD 18332.

204. For over a year, Axion gave its best efforts to produce the plates consistent with the design specification in NAVORD OD 18322. However, Axion could not produce the plates consistent with NAVORD OD 18322 because of deficiencies in the Navy's specification. Among the major deficiencies in NAVORD OD 18332 were the timing, amperage, and chemical composition.

205. In a letter to the Navy dated November 13, 2000, Axion stated, in part:

- "We have spent 1 week on lead plating solution and one week

on lead dioxide plating solution and 1 week on acetate lead dioxide plating trying to make a solution to Government specifications and be able to pass the required sell test. We were unable to do so."

- "Our chemist and factory chemical representative came to the conclusion that the amount per ounce or gram given by the Government document for each element solution was not correct and completely off. Therefore we have spent the past 2 weeks and have mixed the 3 solutions with help from the chemical representative and our chemist to find the correct amount of mixture for each solution."
- "The documents provide us current density and plating time, based on <foot per minute travel time and 109 ASF for lead dioxide plating and 13.2 ASF for lead acetate plating. Our plating line has been designed based on above current density and was designed to run 4 foot per minute and we have purchased rectifiers to provide the required ASF for each solution. This past Thursday and Friday that we ran the machine we find out the ASF called out by the Government was not adequate."

206. Under the Spearin Doctrine, if the Government provides a design specification to a contractor, the Government warrants that if the deliverable is

produced according to the design specification, the consequences shall not be responsible for the consequences of defects in the specifications.

207. The specification in the contract for the manufacture of the plates, NAVORD OD 18332, was a design specification.

208. If Axion built the plate stock with the design specification, the plate stock would have been defective.

209. Axion was not aware that NAVORD OD 18332 was defective at the time of contract award.

210. Upon learning of the defective specification, Axion gave the Navy notice of the defective specification.

211. Axion incurred unanticipated costs in trying to meet the defective specification, NAVORD OD 18332.

212. Inasmuch as NAVORD OD 18322 was defective, pursuant to the Spearin Doctrine, Axion cannot be held responsible if the test on which the Navy terminated the contract revealed the plate stock was defective. Therefore, the termination for default must be converted to a termination for convenience.

213. Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to manufacturer PS-112s because the specifications for the plates were defective.

**COUNT XVI**

**(TERMINATION FOR DEFAULT WAS AN ABUSE OF DISCRETION)**

214. All other allegations of the Complaint are incorporated herein by

reference.

215. Axion sent a letter to the Navy, dated August 27, 2001, stating:

> The design requires Axion to put Acid in copper cans, which is a chemical fact, the acid will eventually dislove (sic) the copper. We are experiencing this phenomenon at this time. We have over thousands of copper cans that have been filled with acid and welded and started leaking on the surface of the diaphragms. We had discussion with Mr. Carey Jackson Quality Assurance Manager, of CP/PHIBROCHEM, the approved source of supply of the acid (34-A, Electrolyte). He states that it is a fact that this acid will eventually penetrate the copper. CP/Phibrochem ships the acid in polyethene containers, which can survive indefinitely without any leakage. Axion has produced polyethylene cans and filled with acid and sealed and clearly there has been no leakage. We wish to submit a VCP or ECP to the government, and suggest that changing from copper cans to polyethylene cans, this will solve the leakage problem, that the government may have experienced infield and will stop any future occurrence.

216. In response to this letter, Mr. Hahin traveled to Axion's facility in Huntsville, AL, to inspect the copper for compliance with the specifications.

217. After Mr. Hahin's visit, Axion also provided Mr. Hahin with

samples of the electrolyte and the copper reservoirs.

218. Axion was asked by the Navy to substantiate that the electrolyte was procured from a qualified source. Axion did so.

219. As a result of his investigation, the Contracting Officer concluded that the copper reservoir manufactured by Axion complied with the Government's specification.

220. Following his investigation, the Contracting Officer called Mr. Latifi, the President of Axion. Also present on during the telephone conversation was a Navy attorney.

221. During the telephone conversation, the Contracting Officer offered Axion a no-cost termination for convenience.

222. Mr. Latifi explained that Axion could not accept a no-cost termination for convenience because Axion has spent a large sum of money trying to perform the Navy Contract.

223. Mr. Latifi further explained that a no-cost termination for convenience would cause great financial harm to Axion.

224. Unable to effect a no-cost termination for convenience, the Navy "trumped-up" a termination for default centered upon a second FAT.

225. A Navy memorandum dated 9/28/01 identified the purpose of the second FAT as follows:

> The First Article Test (FAT) samples were produced with plate stock provided by an outside vendor. The FAT is meant

to verify the manufacturing process and material. The contractor changed the material thereby invalidating the First Articles. The Government requires another FAT of a reduced quantity of batteries be done to validate the manufacturing process currently being utilized to produce the energizers.

226. The "manufacturing process" for the plate stock designated in the contract was NAVORD OD 18332.

227. NAVORD OD 18332, paragraph 6.2 is entitled "Discharge Cell Test."

228. In the presence of representatives of the Navy, Axion successfully performed the Discharge Cell Test for plates manufactured by Axion.

229. The test results provided to the Navy showed that Axion's plates held a load of 105 ohms for approximately 15 minutes whereas previous samples manufactured by other vendors but tested by the Navy only held a load of 105 ohms for a maximum of 9 minutes.

230. After receiving the results of Axion's cell tests, the Navy requested sample plates to test independently.

231. The discharge cell tests conducted by the Navy on cells manufactured by the Axion confirmed Axion's tests.

232. The Navy inquired into why Axion's sample could hold the charge for approximately 40% longer than previous samples. Axion explained that Axion used pure nickel instead of nickel-plated steel. The difference in price, however,

was $1.83 for the nickel plated steel versus $26.00 per pound for the pure nickel.

233. Mr. Korab, the Navy Contracting Officer, gave Axion permission to proceed using the pure nickel plates but emphasized that the pure nickel plates were to be used at no additional cost to the Government.

234. The Default clause does not mandate a termination for default; it merely gives the contracting officer discretion to terminate for default.

235. In determining whether to terminate a contract for default, the exercise of discretion by the Contracting Officer must be fair and reasonable. It cannot be arbitrary or capricious.

236. The discretion of the Contracting Officer is limited by his obligation under FAR § 1.102(b)(3) to "conduct business with integrity, fairness, and openness."

237. Integrity and fairness cannot condone "trumping-up" a termination for default that results in a small businessman losing his retirement savings after the Government has misled the small business with impossible specifications.

238. Because the Contracting Officer's use of a termination for default in this case is contrary to conducting business with integrity and fairness, the Contracting Officer's decision to terminate for default was an abuse of discretion.

239. The abuse of discretion by the Contracting Officer is a basis to convert the termination for default to a termination for convenience.

240. Because the termination for default was an abuse of discretion, Axion is entitled to be compensated under FAR § 52.249-2(g) for attempting to

manufacturer PS-115s.

**COUNT XVII**

**(EQUITABLE ADJUSTMENT – ATTEMPTING TO FABRICATE A COMMERCIALLY IMPRACTICAL AIRGUN)**

241. All other allegations of the Complaint are incorporated herein by reference.

242. The airgun, which Axion was required to fabricate to perform the contract, was commercially impractical.

243. Because the airgun, which Axion was required to fabricate to perform the contract, was commercially impractical, Axion is entitled to an equitable adjustment.

244. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XVIII**

**(EQUITABLE ADJUSTMENT – COMPENSATION FOR AIRGUN PURSUANT TO FAR § 52.245-18)**

245. All other allegations of the Complaint are incorporated herein by reference.

246. FAR § 45.307-3 makes the clause at FAR § 52.245-18 mandatory for negotiated contracts where the contractor will acquire or fabricate special test equipment but the exact identification of the special test equipment to be acquired or fabricated is unknown.

247. The airgun was special test equipment.

248. For contract N00104-96-KA09, the exact identification of the special test equipment was not identified in the solicitation.

249. For contract N00104-96-KA09, the exact identification of the special test equipment was never revealed to Axion by the Navy.

250. For contract N00104-96-KA09, the Navy did not specify if the airgun should be acquired or fabricated.

251. At the time of award of contract N00104-96-KA09, the exact identification of the special test equipment was unknown to the Navy

252. Under FAR § 45.307-3, the Contracting Officer had a duty to include FAR § 52.245-18 into contract N00104-96-KA09.

253. By operation of law (*i.e.,* the Christian Doctrine), FAR § 52.245-18 is incorporated into contract N00104-96-KA09.

254. FAR § 52.245-18 states "The Contractor may either acquire or fabricate special test equipment at Government expense when the equipment is not otherwise itemized in this contract…."

255. The airgun was not itemized in the contract.

256. Under FAR § 52.245-18, Axion is entitled to an equitable adjustment for its expenses of trying first to acquire an airgun from the Army and subsequently for trying to fabricate the airgun.

257. Axion is entitled to the equitable adjustment regardless of whether the termination for default is valid.

## COUNT XIX

## (EQUITABLE ADJUSTMENT – ATTEMPTING TO COMPLY WITH AN IMPOSSIBLE SPECIFICATION OF STORING ELECTROLYTE IN A COPPER RESERVOIR)

258. All other allegations of the Complaint are incorporated herein by reference.

259. Many of the PS-115s that were to be manufactured under contract N0016-96-C-DA09 were anticipated by the Navy to be placed into munitions for use by the Navy's fleet.

260. From the perspective of a fleet Commander, if a PS-115 had a shelf life of less than two years, that PS-115 would not be satisfactory.

261. The fleet expected that any PS-115s provided to the fleet would have a shelf life in excess of two years.

262. The electrolyte designated by the contract corrodes copper after copper is exposed to the electrolyte for a period of one year or longer.

263. It was impossible to manufacturer a copper reservoir that can hold electrolyte for beyond a year without the copper being corroded by the electrolyte.

264. Axion is entitled to an equitable adjustment for attempting to comply with the impossible specification of manufacturing a copper reservoir to store an electrolyte.

265. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

## COUNT XX

## (EQUITABLE ADJUSTMENT – ATTEMPTING TO COMPLY WITH AN IMPOSSIBLE SPECIFICATION FOR MANUFACTURING PLATES)

266. All other allegations of the Complaint are incorporated herein by reference.

267. Contract N00104-96-DA09 required that the plating stock comply with NAVORD 18332.

268 The following previous contracts for PS-115s required the plates to comply with NAVORD 18322:

| CONTRACTOR | AWARD DATE | QUANTITY | UNIT PRICE |
|---|---|---|---|
| Accudyne Corp | 8/93 | 45,736 EA | $16.90 |
| Accudyne Corp | 6/92 | 30,000 EA | $13.54 |

269. In performing the two contracts to produce PS-115s, Accudyne experienced problems with manufacturing the plates.

270. In performing the two contracts to produce PS-115s, Accudyne received an equitable adjustment for trying to perform to a defective specification pertaining to the manufacturing of the plates.

271. Axion's letter to the Navy dated November 13, 2000 gave the Navy notice that of the impossibility of complying with the contract's specifications with regard to the manufacturing of the plates.

272. Axion is entitled to an equitable adjustment for attempting to comply with an impossible specification pertaining to the manufacturing of the plates.

273. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXI**

**(EQUITABLE ADJUSTMENT – GOVERNMENT'S SUPERIOR KNOWLEDGE OF AIRGUN)**

274. All other allegations of the Complaint are incorporated herein by reference.

275. Axion is entitled to an equitable adjustment for performing work that could have been avoided but for the failure of the Government to disclose its superior knowledge of the difficulties in fabricating an airgun.

276. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXII**

**(EQUITABLE ADJUSTMENT -- AXION WAS MISLED THAT THE AIRGUN WOULD NOT REQUIRE A SIGNIFICANT AMOUNT OF DEVELOPMENTAL WORK)**

277. All other allegations of the Complaint are incorporated herein by reference.

278. The Navy's solicitation consisted of a design specification for which the Navy was seeking a previously manufactured, build-to-print deliverable.

279. The specification did not inform Axion that the awardee must fabricate an air gun that would require a significant amount of developmental

work.

280. The specification misled Axion that the awardee would not have an obligation to engage in a significant amount of development for special test equipment.

281. To fabricate the airgun, Axion had to engage in a significant amount of development.

282. Axion is entitled to an equitable adjustment for being misled.

283. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

## COUNT XXIII

## (EQUITABLE ADJUSTMENT -- BREACH OF IMPLIED WARRANTY THAT AIRGUN WOULD EITHER BE COMMERCIALLY AVAILABLE OR A NONDEVELOPMENTAL ITEM)

284. All other allegations of the Complaint are incorporated herein by reference.

285. The Government sought to purchase PS-115s using Level III, build-to-print specifications.

286. By providing Level III, build to print specifications, the Government implicitly warranted that the special test equipment would either be commercially available or a non-developmental item.

287. The airgun was not commercially available.

288. The airgun was not a non-developmental item.

289. The airgun was special test equipment.

290. The Government breached its implied warranty that the airgun would either be commercially available or non-developmental.

291. Axion is entitled to an equitable adjustment for the Government's breach its implied warranty.

292. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXIV**

**(EQUITABLE ADJUSTMENT -- BREACH OF DUTY TO COOPERATE CONCERNING THE AIRGUN)**

293. All other allegations of the Complaint are incorporated herein by reference.

294. The Government breached its duty to cooperate regarding the airgun.

295. The breach resulted in Axion spending excessive resources in trying to fabricate an airgun that Axion would not have had to expend if the Government had not breached its duty to cooperate.

296. Axion is entitled to an equitable adjustment for the breach by the Government of its duty to cooperate.

297. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXV**

**(EQUITABLE ADJUSTMENT – MUTUAL MISTAKE REGARDING**

**AIRGUN)**

298. All other allegations of the Complaint are incorporated herein by reference.

299. Count XXV is being pled in the alternative to Count XXI.

300. If the Government did not have superior knowledge of the difficulty in fabricating the airgun, then there was a mutual mistake that the airgun would require significant development.

301. At the time of contract award, the Navy did not know that the airgun would require a contractor to undertake more than a modest amount of development.

302. At the time of contract award, Axion did not know that the airgun would require a significant amount of development.

303. The mutual mistake was to a basic assumption of the contract.

304. The mutual mistake had a material effect on the agreed exchange of performance.

305. Axion is entitled to an equitable adjustment for the mutual mistake.

306. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXVI**

**(EQUITABLE ADJUSTMENT – GOVERNMENT SUPERIOR KNOWLEDGE THAT ELECTROLYTE WOULD CORRODE COPPER)**

307. All other allegations of the Complaint are incorporated herein by

reference.

308. As shown in exhibit 4, two Army employees, Jeff Swank and Allan Goldberg of the ARL, were aware that, concerning the PS-115, "Initial studies of reservoir/electrolyte materials indicated that they were not compatible."

309. As shown in exhibit 4, two Army employees, Jeff Swank and Allan Goldberg of the ARL, were aware that, concerning the PS-115, "virtually every lot produced prior to Nov 1980 contained leaking batteries."

310. At the time of contract award, Axion was not aware of that previously manufactured PS-115s were experiencing problems with electrolyte leaking from the PS-115s.

311. Axion incurred additional expenses as a result of the Government not disclosing its superior knowledge.

312. Axion is entitled to an equitable adjustment for the additional expense incurred as a result of the Government failing to disclose its superior knowledge.

313. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

## COUNT XXVII

## (EQUITABLE ADJUSTMENT – APPLICATION OF SPEARIN DOCTRINE TO LEAKING ELECTROLYTE)

314. All other allegations of the Complaint are incorporated herein by reference.

315. Under the Spearin Doctrine, the Government warranted that if Axion complied with the Level III drawings, the electrolyte would not leak.

316. The Government required that the reservoir for the PS-115 be made of copper.

317. Axion manufactured the reservoir consistent with the Government's Level III drawing.

318. Several months after the electrolyte was placed into the copper reservoirs, the reservoirs began to leak electrolyte because the electrolyte corroded the reservoirs.

319. Because the Government warranted that if Axion complied with the Level III drawings, the electrolyte would not leak, the Government breached its warranty under the Spearin Doctrine.

320. Axion is entitled to an equitable adjustment for seeking to comply with the Level III drawings.

321. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

## COUNT XXVIII

## (EQUITABLE ADJUSTMENT – GOVERNMENT'S SUPERIOR KNOWLEDGE OF DIFFICULTY IN MANUFACTURING PLATES)

322. All other allegations of the Complaint are incorporated herein by reference.

323. The Army had previously awarded two contracts to Accudyne

Corporation to produce PS-115s.

324. Accudyne experienced problems in manufacturing the plates for the PS-115s.

325. For its problems in manufacturing the plates, Accudyne received an equitable adjustment.

326. Axion incurred additional expenses as a result of the Government not disclosing its superior knowledge regarding problems encountered in manufacturing the plates.

327. Axion is entitled to an equitable adjustment for the additional expense resulting from the failure of the Government to disclose its superior knowledge.

328. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**COUNT XXIX**

**(EQUITABLE ADJUSTMENT – APPLICATION OF SPEARIN DOCTRINE TO PLATES)**

329. All other allegations of the Complaint are incorporated herein by reference.

330. The contract incorporated a design specification for the plates.

331. Axion manufactured the plates in a manner consistent with the design specification in the contract.

332. The plates manufactured by Axion that were consistent with the

design specification could not meet the performance requirements for the PS-115s.

333. Because the plates manufactured by Axion consistent with the design specification could not meet the performance requirements of the PS-115s, the design specification was defective.

334. Because the design specification for the plates was defective, the Government breached its implied warranty of the design specification.

335. Axion is entitled to an equitable adjustment for Axion's attempt to comply with the defective design specification as well as Axion's expenses to change the manufacturing process to produce plates that met the PS-115 component requirements for the plates.

336. Axion is entitled to the equitable adjustment regardless of whether the termination for default was valid.

**WHEREFORE**, Plaintiff, Axion Corporation requests this Honorable Court:

a. Declare and adjudge that, because the TERMINATION FOR DEFAULT must be converted to a TERMINATION FOR CONVENIENCE, Axion is entitled to the fair compensation, after liquidation of partial payments, of $3,747,298;

b. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XVII, that Axion is entitled to an equitable adjustment of $1,534,934;

c. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XVIII, that Axion is entitled to an equitable adjustment of $1,534,934;

d. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XIX, that Axion is entitled to an equitable adjustment of $577,004;

e. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XX, that Axion is entitled to an equitable adjustment of $1,416,309;

f. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXI, that Axion is entitled to an equitable adjustment of $1,534,934;

g. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXII, that Axion is entitled to an equitable adjustment of $1,534,934;

h. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXIII, that Axion is entitled to an equitable adjustment of $1,534,934;

i. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXIV, that Axion is entitled to an equitable adjustment of $1,534,934;

j. Declare and adjudge, regardless of whether the termination for

default was valid, pursuant to Claim XXV, that Axion is entitled to an equitable adjustment of $1,534,934;

k. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXVI, that Axion is entitled to an equitable adjustment of $577,004;

j. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXVII, that Axion is entitled to an equitable adjustment of $577,004;

k. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXVIII, that Axion is entitled to an equitable adjustment of $1,416,309;

l. Declare and adjudge, regardless of whether the termination for default was valid, pursuant to Claim XXIX, that Axion is entitled to an equitable adjustment of $1,416,309;

m. Grant such other declaratory, equitable, and other relief as this Honorable Court deems just and appropriate.

Dated this the 4th day of March, 2004.

Respectfully submitted,

**ATTORNEY OF RECORD:**

**RICHARD J.R. RALEIGH JR.**
**WILMER & LEE, P.A.**
100 Washington Street, Suite 200
Huntsville, Alabama 35801
(256) 533-0202 Telephone
(256) 533-0302 Facsimile
rraleigh@wilmerlee.com

**OF COUNSEL:**

**JEROME S. GABIG, JR.**
4811 Cove Creek Drive
Brownsboro, AL 35741
(256) 509-0279 Telephone
(256) 512-0020 Facsimile
gabig3@comcast.net